1

2

3

4

5                IN THE UNITED STATES DISTRICT COURT

6              FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  WILLIAM HELM, et al.,                         No. C 08-01184 SI

9             Plaintiffs,              **ORDER DENYING PLAINTIFFS'
                                       MOTION FOR CLASS CERTIFICATION**
10    v.

11  ALDERWOODS GROUP, INC.,

12            Defendant.
                                       /
13

14       On December 17, 2009, the Court heard oral argument on plaintiffs' motion for class

15  certification.  Having carefully considered the arguments of the parties and the papers submitted, the

16  Court hereby DENIES plaintiffs' motion.

17

18                            **BACKGROUND**

19       The subject of this litigation is a wage and hour dispute brought by current and former

20  employees of Alderwoods Group, Inc. ("Alderwoods"), a provider of funerary services.  As set forth

21  in detail in this Court's July 29, 2009 Order (Docket No. 174), this action originated with a complaint

22  filed in the United States District Court for the Western District of Pennsylvania, *Prise, et al. v.*

23  *Alderwoods Group, Inc., et al.*, No. 06-1641.  That complaint originally included both state law claims

24  and federal claims under the Fair Labor Standards Act ("FLSA") against Alderwoods and several other

25  related defendants.  The district court in *Prise* declined to exercise supplemental jurisdiction over

26  plaintiffs' state law claims, leaving only the FLSA claims.  The dismissal of the state law claims resulted

27  in the filing of a class action complaint in the Alameda County Superior Court on December 5, 2007

28  entitled *Helm, et al. v. Alderwoods Group Inc., et al.*, alleging state law wage and hour claims against

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Alderwoods.[1]

2        On February 27, 2008, defendants removed the action to federal court, invoking this Court's

3  diversity jurisdiction under the Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. § 1332(d). The

4  operative version of plaintiffs' complaint is the Second Amended Complaint ("SAC"), filed on August

5  14, 2009. As defined in the SAC, plaintiffs bring suit on behalf of a putative class consisting of "those

6  employees and former employees of defendant who were suffered or permitted to work by defendant

7  and not paid their regular or statutorily required rate of pay for all hours worked." SAC ¶ 19. The

8  putative class consists of "several thousands of employees," a "significant percentage" of whom are in

9  California. *Id.* ¶ 24. The SAC alleges ten causes of action, including violations of California's Labor

10  Code; violations of the wage and hour laws of 37 other states and Puerto Rico; unlawful business

11  practices in violation of California's Unfair Competition Law; and common law claims for unjust

12  enrichment, conversion, fraud, misrepresentation, breach of contract, breach of the implied covenant

13  of good faith and fair dealing, and quantum meruit. Plaintiffs allege that Alderwoods implemented eight

14  nationwide policies, as set forth in a policy manual and policy memoranda disseminated to all

15  Alderwoods funeral homes, that deprived plaintiffs of adequate compensation for time worked. These

16  policies were: failing to compensate employees for time spent (1) "on-call," (2) performing "community

17  work," (3) attending mandatory training, or (4) meeting with clients to discuss "pre-need purchases";

18  (5) requiring employees to work during meal breaks; (6) refusing to pay overtime unless it had been pre-

19  approved; (7) directing employees not to record their hours for all time worked; and (8) failing to

20  correctly calculate an employee's regular rate of pay for purposes of determining his or her overtime

21  rate. This action involves no federal claims.

22        Presently before the Court is plaintiffs' motion seeking certification of this lawsuit as a class

23  action. Plaintiffs have defined eight separate subclasses, one for each of the alleged violations listed

24  above. Each subclass contains a sub-subclass consisting of only California employees, but the

25  subclasses are not otherwise differentiated by jurisdiction.

26  **I.     Subclass I: Community Work Policy**

27

28     [1] Plaintiffs dismissed the other defendants, leaving Alderwoods as the only remaining defendant.

2

**United States District Court**
For the Northern District of California

1  Subclass I consists of current and former hourly employees who were allegedly required to

2  perform unpaid "community work" in order to generate business and increase revenues for Alderwoods.

3  In support of their allegation that Alderwoods maintained a company-wide policy to this effect,

4  plaintiffs submit declarations from eight of the named plaintiffs and cite the deposition testimony of

5  eleven others. *See, e.g.*, Carswell Depo., Pltf. Ex. 68, at 135:7-137:9 (Georgia and Florida employee

6  was instructed by managers and read in company policy manual that employees were "require[d] . . .

7  to belong to some type of community organization"); Kamienski Aff., Pltf. Ex. 49, ¶¶ 12-15 (California

8  General Manager was informed by Area Manager, his superior, that employees "were supposed to

9  perform [community] work for the company on a purely volunteer basis, not a paid basis.  This work

10  was to be completed outside of their regular scheduled work day"); Bath Aff., Pltf. Ex. 39, ¶¶ 15-16

11  (Kansas Area Manager was told by Regional Managers, his superiors, "that under the Alderwoods

12  corporate policy community work was an expectation but was never compensated," and was "required

13  . . . to communicate the policy to employees at each of [his] locations and ensure they understood and

14  complied with it").

15  Plaintiffs further allege that they were required to report their community service hours and were

16  evaluated based on their participation in community work.  For example, a New York employee testified

17  that employees were required to report their hours and that "[i]t was clear that [Alderwoods] expected

18  something on that report from each employee," to the extent that one coworker would falsely report

19  community service hours. *See* Long Depo., Pltf. Ex. 80, at 149:9-22.  A General Manager employed

20  in California stated that he was "required to regularly check in with employees to ensure they were

21  completing community work" and to "keep upper management aware" of employees' completion of

22  such work.  Kamienski Aff. ¶ 16.  He stated that employees' annual performance review took into

23  account how much community work they had performed. *Id.* ¶ 18.

24  To demonstrate the existence of a nationwide community work policy, plaintiffs rely heavily on

25  the Alderwoods Community Leadership Program, which they describe in their class certification motion

26  as a "company-wide initiative Alderwoods launched in January 2004."  Pltf. Mot. for Class Cert. at 8.

27  Plaintiffs' evidence includes portions of the Program binders distributed to all Alderwoods locations.

28  The binders were intended to provide each Alderwoods location with "a comprehensive plan for

3

1    building strong and long-term relationships between your location and the community in which you

2    operate." Pltf. Ex. 3, at 13070. The binders set forth detailed, step-by-step instructions each location

3    was to follow. *Id.* at 13075-81.

4    Alderwoods asserts that it maintained no company-wide policy requiring unpaid community

5    work. It points to declarations and deposition testimony from plaintiffs who stated they were either not

6    required to perform community work or were compensated for such work. *See, e.g.*, Burgess Depo.,

7    Def. Ex. N-3, at 169:13-23 (North Carolina employee was never told that community involvement was

8    a "requirement," but was told such involvement "would look good"); Johnson Depo., Def. Ex. N-13,

9    at 45:9-11 (California employee was not required to, and did not, perform any community work); Rady

10   Depo., Def. Ex. N-28, at 61:17-62:17, 68:21-24 (Pennsylvania employee did not believe policy manual

11   stated employees would not be compensated for community work, and stated that, pursuant to a "policy

12   change" near the end of her employment, she was compensated for several instances of community

13   work).

14   Alderwoods further asserts that plaintiffs' reliance on the Community Leadership Program is

15   misplaced because that effort was an incentive program expressly aimed at overtime exempt managers,

16   not non-exempt hourly employees. *See* Pltf. Ex. 2 at 4971 ("Th[e] first step requires *location managers*

17   to identify and create their Leadership Network.") (emphasis added).

18

19   **II.    Subclass II: On-Call Policy**

20   Plaintiffs allege that Alderwoods maintained a nationwide policy of requiring employees to take

21   phone calls and perform other on-call work, such as removal and embalming, outside of regular work

22   hours and without compensation. *See, e.g.*, Bath Aff. ¶¶19-23 (Kansas employee was required to handle

23   phone calls and perform embalmings and removals off-the-clock and was "not always compensated for

24   [his] work," and was told by Regional managers that on-call policy "was company-wide and came

25   'directly from up above' and could not be changed."); Detschner Depo., Pltf. Ex. 70, at 125:23-126:10

26   (same in Massachusetts).

27   Plaintiffs's allegations concern two time periods. Plaintiffs allege that, prior to March 2006,

28   Alderwoods employees were paid a piece rate for on-call work such as removals, but were not paid for

4

**United States District Court**
For the Northern District of California

1    telephone calls and other work performed off-site. *See, e.g.*,  Diggs Depo., Pltf. Ex. 71, at 77:1-14

2    (Alaska); Gonzales Depo., Pltf. Ex. 74, at 54:1-3 (New Mexico).  In March 2006, however, Alderwoods

3    changed its policy and began compensating employees on an hourly basis for answering phone calls and

4    performing other on-call work; as part of this policy, Alderwoods provided a form log on which

5    employees were directed to record their on-call work time.  Plaintiffs have submitted an August 2005

6    PowerPoint presentation prepared by the company discussing the policy change. *See generally* Pltf. Ex.

7    24.  Plaintiffs allege, however, that even after the policy change, Alderwoods continued its practice of

8    not compensating employees for time spent getting ready to respond to calls, including showering,

9    dressing, and travel time.  *See, e.g.*, Gonzales Depo. at 135:5-136:25 (New Mexico plaintiff not

10   compensated for the 15 minutes she spent preparing to go out on each removal).

11           Alderwoods asserts that it had no uniform policy requiring employees to perform uncompensated

12   on-call work.  Alderwoods cites deposition  testimony of plaintiffs who stated they were not required

13   to perform on-call work. *See, e.g.*, Keath Depo., Def. Ex. N-17, at 184:10-185:18 (Kansas plaintiff);

14   Takesian Depo., Def. Ex. N-31, at 126:19-127:4 (Arizona plaintiff).

15           Alderwoods also cites deposition testimony indicating that some employees were compensated

16   on an hourly basis for on-call work as of July 2005, or even earlier.  *See* Rady Depo. at 93:3-94:7

17   (Pennsylvania plaintiff stated that Alderwoods' compensation policy for on-call work changed as of July

18   2005); Prise Depo., Def. Ex. N-27, at 117:17-118:14 (same); *see also* Kamienski Depo., Def. Ex. N-16,

19   at 124:11-15 (California manager employed from April 2004 to June 2005 did not have any employees

20   paid on a piece rate basis); Greeno Decl., Def. Ex. O-25, ¶ 10 (employees in California paid on hourly

21   basis for on-call work as early as 2002 or 2003).

22

23   **III.     Subclass III: Training Compensation Policy**

24           Plaintiffs make allegations concerning two categories of training employees were allegedly

25   required to attend on an unpaid, off-the-clock basis. First, plaintiffs allege that employees were required

26   to attend job training, including health-related training, continuing education classes, sexual harassment

27   training, and OSHA training. *See, e.g.*, Weinstein Aff., Pltf. Ex. 65, ¶ 13 (Florida employee required

28   to attend training outside regular work day, and was told by Regional Manager that Alderwoods would

5

**United States District Court**
For the Northern District of California

1  not compensate for training); McDonald Aff., Pltf. Ex. 55, ¶¶ 14-17 (Texas employee required to attend

2  training both during and outside regular work day, and was told by manager that Alderwoods would not

3  compensate for training completed outside the work day); Hollis Aff., Pltf. Ex. 46, ¶ 20 (New York

4  employee stated Alderwoods' training policy was "rigidly enforced by company management").

5        Second, plaintiffs allege that, in states where pre-need funeral sales may be funded by insurance,

6  Alderwoods required all licensed funeral directors to become licensed insurance agents, and did not

7  compensate them for time spent attending insurance classes, studying for and taking exams, or meeting

8  continuing education requirements. *See* Pramik Aff., Pltf. Ex. 56, ¶¶ 21-29 (Pennsylvania employee);

9  Prise Aff., Pltf. Ex. 58, ¶¶ 25-31 (same); Rady Aff., Pltf. Ex. 60, ¶¶ 22-28. (same); Takesian Depo., Pltf.

10  Ex. 88, at 125:1-126:4 (Arizona employee not compensated for time spent in licensing classes and on

11  course and test materials, but was told he would be compensated once he earned his license).

12        Alderwoods asserts that not all employees in all states were required to attend training, even

13  within the same position. *See, e.g.*, Weinstein Depo., Def. Ex. N-34, at 63:4-10 (Florida employee

14  stated that the company's training policy "only applied to the funeral directors we hired and that was

15  it"); Korrell Decl., Def. Ex. O-30, ¶ 17 (Washington funeral director not required to attend any training

16  outside of work hours); Diggs Depo., Def. Ex. N-9, at 70:23-71:9 (Alaska funeral director did not attend

17  any training because Alaska does not require continuing education to maintain a funeral director

18  license). Alderwoods further asserts that some employees stated they were paid for time spent attending

19  training, even when it occurred outside their regular work day. *See* Detschner Depo., Def. Ex. N-8, at

20  111:15-112:17 (Massachusetts employee reported three hours of overtime for CPR training).

21        Alderwoods also submits evidence to support its argument that it did not require employees to

22  become licensed insurance agents in order to make pre-needs sales, and that employees who did so were

23  compensated for their time. *See* Curnow Decl., Def. Ex. O-14, ¶ 17.

24

25  **IV.    Subclass IV: Pre-Needs Policy**

26        Plaintiffs allege that Alderwoods maintained a company-wide policy of requiring employees to

27  make pre-needs presentations and sell pre-needs funeral policies – policies which allow an individual

28  to prepay funeral and death services during his or her lifetime – after work hours without compensation.

*United States District Court*
*For the Northern District of California*

6

**United States District Court**
For the Northern District of California

1   Plaintiffs allege that Alderwoods required them to schedule such pre-needs appointments based on the

2   convenience of the family, regardless of whether the appointment fell outside an employee's normal

3   work hours, and that management monitored employees' compliance with the policy. *See, e.g.*, Johnson

4   Aff., Pltf. Ex. 47, ¶¶12-17 (Mississippi funeral director required  to schedule appointments at the

5   convenience of the family; although all presentations were reported to management, employee was not

6   compensated for time); Hollis Aff. ¶¶ 13-18 (same in New York); Daigle Depo., Pltf. Ex. 69, at 232:2-

7   233:10 (Louisiana funeral director performed off-the-clock pre-needs work up to three times per week).

8   Alderwoods counters that, in some locations, it maintained a separate sales staff or designated

9   individual to handle pre-needs presentations and sales. *See* Burkle Depo., Def. Ex. N-4, at 36:20-37:4

10   (Michigan location maintained a staff of two employees to make pre-needs sales); Ore Depo., Def. Ex.

11   N-24, at 31:1-25 (Pennsylvania location had an outside pre-needs salesperson who was not paid by

12   Alderwoods).  Alderwoods further asserts that some plaintiffs who did perform such presentations and

13   sales outside regular work hours were compensated for their time. *See, e.g.*, Friden Decl., Def. Ex. O-

14   21, ¶ 13 (Washington funeral director ordinarily left pre-needs work to designated pre-needs counselors,

15   but was paid when he did need to attend pre-needs presentations); Harper Decl., Def. Ex. O-25, ¶ 8 (in

16   Texas, funeral directors who did pre-needs work after hours were compensated).

17

18   **V.      Subclass V: Meal Break Policy**

19   Plaintiffs allege that Alderwoods suffered or permitted its employees to perform work during

20   meal or rest breaks without compensation. Plaintiffs cite affidavits of numerous employees stating that

21   their meal and rest breaks were eliminated or interrupted on a regular basis in order to perform unpaid

22   work. *See* Detschner Aff., Pltf. Ex. 42, ¶ 10 (Massachusetts); Keath Aff., Pltf. Ex. 50, ¶ 12 (Kansas);

23   Lanza Aff., Pltf. Ex. 53, ¶ 12 (Washington); Long Aff., Pltf. Ex. 54, ¶ 13 (New York); McDonald Aff.

24   ¶ 13 (Texas); Takesian Aff., Pltf. Ex. 62, ¶¶ 9-12 (in Arizona, office manager would alter time cards that

25   did not exclude a full meal break from hours worked each day, even on days when the employee had

26   worked through his or her meal break). Plaintiffs assert that employees were told during staff meetings

27   that no overtime could be accrued for work performed during meal breaks, that there would be no paid

28   meal or rest breaks, and that all employees must clock in and out for a 30-minute lunch. Plaintiffs cite

7

the minutes of a staff meeting held on May 24, 2006, which state, "Everyone must punch out for lunch"; "There should be no overtime accrued for lunch periods"; and "No paid lunches or breaks."  Pltf. Ex. 28 at 2338.

Alderwoods contends that it had no policy denying employees compensation for missed breaks. Alderwoods points to the statements of some plaintiffs that when they missed a break, they reported the time and were paid for it.  *See, e.g.*, Lanza Depo., Def. Ex. N-19, at 51:12-52:20 (Washington employee paid for work performed during breaks); Cain Decl., Def. Ex. O-9, ¶ 14 (Kansas employee missed lunch breaks "on occasion," but would remain on the clock in order to be paid for that time);  Elliot Decl., Def. Ex. O-18, ¶ 11 (Texas employees were given an hour for lunch, but were not required to record a full lunch break if they worked some or all of that time).

Alderwoods further asserts that, during staff meetings, employees were only told they must clock out for meal break actually taken, and were not told they would not be paid for working through meal breaks.  Alderwoods notes that the meeting minutes cited by plaintiffs reflect that employees should note missed lunch breaks on their time cards and could seek payment for that time.  Pltf. Ex. 28 at 2338 ("If you do not get a lunch break and you are expecting to be paid, approval is required by a Manager"); *id.* at 10515 ("If you do not take lunch – say why, you cannot go without lunch everyday, not acceptable").

**VI.    Subclass VI: Pre-Approval Policy**

Plaintiffs allege that Alderwoods maintained a policy of requiring them to obtain pre-approval for overtime hours and refusing to compensate them for non-pre-approved hours.  Plaintiffs first cite Alderwoods' policy manual, as well as company memos and meeting minutes, to support their allegations regarding the existence of a uniform policy.  *See* Pltf. Ex. 29 (February 2004 policy manual stating that a manager must sign a completed time card "to verify that the hours are accurate and that any overtime recorded is approved"); Pltf. Ex. 30 (2005 policy manual stating, "All overtime . . . must be approved in advance by management"); Pltf. Ex. 31 at 561 (Pittsburgh meeting minutes stated that "any and all overtime must be pre-approved . . . . Any overtime that is submitted without prior approval will not be paid"); 12519 (Missouri staff memo stated that "no overtime [will] be paid without prior approval").  Plaintiffs also cite the affidavits of employees who testified that Alderwoods permitted

1  them to work overtime hours that had not been pre-approved and did not compensate them for those

2  hours. *See, e.g.*, Detschner Aff. ¶ 8 (Massachusetts); Johnson Aff. ¶ 21 (Mississippi employee assigned

3  overtime by management, but not compensated for it); Jones Aff., Pltf. Ex. 48, ¶ 18 (Alaska); Kuhta

4  Aff., Pltf. Ex. 51, ¶ 7 (Florida).

5       Alderwoods argues that plaintiffs' own testimony shows greatly varying experiences, with some

6  plaintiffs testifying that they were paid for overtime regardless of whether it had been pre-approved.

7  *See, e.g.*, Burgess Depo. at 112:2-115:21 (North Carolina employee's non-pre-approved overtime

8  typically paid anyway); Diggs Depo. at 131:1-24 (Alaska employee not required to seek pre-approval

9  for overtime); Escobar Depo., Def. Ex. N-10, at 77:21-78:7 (California employee not required to seek

10  pre-approval for overtime).

11       Alderwoods asserts that its policy manual establishes only that working overtime without

12  approval "may lead to disciplinary action," not that employees would not be paid for that time. Def. Ex.

13  S, ex. 3, at 08 ("Working overtime that has not been pre-approved by the employee's manager may lead

14  to disciplinary action.").

15

16  **VII.   Subclass VII: Unrecorded Work Time Policy**

17       Subclass VII consists of employees who were allegedly directed not to record off-the-clock work

18  they performed and therefore were not compensated for that work. Plaintiffs allege that Alderwoods

19  instructed employees not to clock in early or clock out late, despite being aware that employees

20  performed work before or after their scheduled shifts; plaintiffs further allege that managers would

21  sometimes physically alter their timesheets in order to reduce the hours reported. *See, e.g.*, Burgess

22  Depo., Pltf. Ex. 66, at 131:14-132:6 (North Carolina employee was told, "you're not going to be paid

23  for it if you punch in early"); *id.* at 95:22-25 (management "marked off" overtime times reported on

24  time sheet); Detschner Depo. at 115:2-117:16 (Massachusetts employee was often asked to come in 15

25  to 30 minutes early, but employees were discouraged from reporting "inconsequential amounts of time,

26  for example, 20 minutes"); Garza Depo., Pltf. Ex. 73, at 55:5-14 (Texas employee instructed to clock

27  in and out at regular times despite being asked to perform work before and after scheduled shifts).

28       Alderwoods points to deposition testimony indicating that some plaintiffs were not instructed

*United States District Court*
*For the Northern District of California*

1    to refrain from clocking in or out when they performed work before or after a scheduled shift. *See, e.g.*,

2    Diggs Depo. at 103:1-25, 107:1-9 (Alaska employee consistently recorded hours longer than his

3    scheduled shift); Schabloski Depo., Def. Ex. N-30, at 87:25-88:6 (Michigan employee never told to

4    come in early or stay late without recording the time); Wilkinson Depo., Def. Ex. N-36, at 96:3-97:6

5    (Kansas employee routinely asked to come in before scheduled shift but always recorded the time and

6    did not believe his timecard was ever altered to omit the time).

7

8    **VIII.   Subclass VIII: Regular Rate Policy**

9         Plaintiffs allege that Alderwoods failed to include all remuneration, including bonuses and

10   commissions, in calculating employees' regular rate of pay for purposes of determining their overtime

11   rate of pay.  Plaintiffs submit as evidence of this policy an email sent by human resources personnel at

12   SCI, the company that acquired Alderwoods in November 2006, stating that Alderwoods "was not

13   calculating the OT [overtime] premium correctly.  They did NOT take the bonus into consideration

14   when calculating the OT for the employees."  Pltf. Ex. 34 at 12847.

15        Alderwoods asserts that it had no policy of excluding bonuses and commission from an

16   employee's regular rate of pay.  It submits a declaration from its Senior Payroll Manager, accompanied

17   by additional emails, stating that plaintiffs' evidence reveals only a temporary glitch in Alderwoods'

18   software around the time of the merger with SCI which was corrected by issuing back pay to the

19   affected employees. *See* Hollinger Decl., Def. Ex. U.

20

21                              **LEGAL STANDARD**

22        The decision whether to certify a class is committed to the discretion of the district court within

23   the guidelines of Federal Rule of Civil Procedure 23 ("Rule 23").  *See* Fed. R. Civ. P. 23; *Cummings*

24   *v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003).  A court may certify a class if a plaintiff demonstrates that

25   all of the prerequisites of Rule 23(a) have been met, as well as at least one of the requirements of Rule

26   23(b). *See* Fed. R. Civ. P. 23; *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

27        Rule 23(a) provides four prerequisites that must be satisfied for class certification: "(1) the class

28   is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact

**United States District Court**
For the Northern District of California

1  common to the class; (3) the claims or defenses of the representative parties are typical of the claims

2  or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests

3  of the class."  Fed. R. Civ. P. 23(a).

4     A plaintiff seeking certification must also establish that one or more of the grounds for

5  maintaining the suit are met under Rule 23(b), including (1) that there is a risk of substantial prejudice

6  from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be

7  appropriate; or (3) that common questions of law or fact predominate and the class action is superior

8  to other available methods of adjudication.  Fed. R. Civ. P. 23(b).

9     In determining the propriety of a class action, the court must focus solely on whether the

10  requirements of Rule 23 are met, not whether the plaintiff has stated a cause of action or will prevail on

11  the merits.  *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).  Accordingly, the court must

12  accept as true the substantive allegations made in the complaint. *In re Petroleum Prods. Antitrust Litig.*,

13  691 F.2d 1335, 1342 (9th Cir. 1982); *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  However,

14  although the court may not require preliminary proof of the substance of the plaintiff's claims, it "need

15  not blindly rely on conclusory allegations which parrot Rule 23 requirements," but may also "consider

16  the legal and factual issues presented by plaintiff's complaint."  2 Alba Conte & Herbert B. Newberg,

17  *Newberg on Class Actions* § 7.26 (4th ed. 2005).  The court should conduct an analysis that is as

18  rigorous as necessary to determine whether class certification is appropriate.  *Gen. Tel. Co. of the Sw.*

19  *v. Falcon*, 457 U.S. 147, 161 (1982).

20

21  **DISCUSSION**

22     Each of plaintiffs' ten causes of action arises from the same basic factual allegation:  that

23  Alderwoods maintained company-wide policies that deprived its employees of adequate compensation.

24  Accordingly, the Court's discussion will focus on whether the named plaintiffs can represent the

25  putative class with respect to any of the eight specific policies identified in the SAC.  Plaintiffs contend

26  that they can satisfy each of the requirements of Rule 23(a), as well as the "predominance" and

27  "superiority" requirements of Rule 23(b)(3).

28     Plaintiffs have undoubtedly presented a factual question common to all members of the putative

**United States District Court**
For the Northern District of California

11

1  class, namely, whether the allegedly company-wide policies existed.   Under Rule 23(b)(3)'s

2  predominance requirement, however, the court must go beyond asking whether any common questions

3  exist and ask whether these common questions "predominate over any questions affecting only

4  individual members" of the putative class. Fed. R. Civ. P. 23(b)(3).  In other words, the predominance

5  analysis focuses on "the relationship between the common and individual issues.  When common

6  questions present a significant aspect of the case and they can be resolved for all members of the class

7  in a single adjudication, there is clear justification for handling the dispute on a representative rather

8  than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotation marks and citation omitted).

9  Ultimately, the Rule 23(b)(3) inquiry "tests whether proposed classes are sufficiently cohesive to

10  warrant adjudication by representation."  *Id.* (citation omitted).

11

12  **I.**     **Subclass I: Community Work Policy**

13       Plaintiffs assert that Subclass I presents several common factual questions, including whether

14  Alderwoods maintained a company-wide policy requiring employees to do unpaid, off-the-clock

15  community work, tracked employees' compliance with the policy, and evaluated employees based on

16  their performance.  As described above, the declarations and deposition testimony submitted by the

17  parties reflect variation as to whether plaintiffs in different locations were subject to a community work

18  policy.  For example, although plaintiffs from Georgia, Florida, Kansas, California, and New York

19  stated that community work was required, a different California plaintiff as well as plaintiffs from North

20  Carolina and Pennsylvania either stated that they were not required to perform community work or were

21  compensated for such work.  The Pennsylvania plaintiff further alluded to a "policy change" during her

22  employment with Alderwoods.  To resolve plaintiffs' claims with regard to the community work policy,

23  the Court would therefore need to inquire on an individual basis whether each of Alderwoods' funeral

24  home locations implemented this policy, whether any location or locations changed their policy with

25  respect to compensation for community work during the period at issue in the suit, and whether the

26  policy was specific to any particular position or positions, such as funeral directors.

27       Plaintiffs' counsel asserted at oral argument that the existence of a community work requirement

28  could be proved on a common basis by evidence of a written policy, in the form of materials related to

**United States District Court**
For the Northern District of California

1    the Alderwoods Community Leadership Program.  However, the Community Leadership program gives

2    rise to individual inquiries as to which category or categories of employees were included and whether

3    and when the program was implemented in each location.  Accordingly, the Court finds that Subclass

4    I is not appropriate for class treatment.

5

6    **II.      Subclass II: On-Call Policy**

7           Plaintiffs assert that Subclass II presents common issues as to whether Alderwoods required

8    employees to perform unpaid on-call work, paid them on a piece rate prior to March 2006, and

9    continued even after March 2006 to fail to compensate for all on-call time worked.  The operative

10   question in this dispute, however, is not whether employees were asked to perform on-call work, but

11   whether they were properly compensated for it.  Plaintiffs point to documents showing the existence of

12   a piece-rate payment policy.  The declarations and deposition testimony submitted by the parties,

13   however, shows significant variation in employees' experiences with regard to compensation.  Although

14   Kansas and Massachusetts plaintiffs stated they were not compensated for on-call work, and Alaska and

15   New Mexico plaintiffs testified they were compensated on a piece-rate basis, two Pennsylvania plaintiffs

16   stated that Alderwoods switched to hourly compensation as of July 2005, one California manager

17   testified that the piece rate did not exist as of April 2004, and another California manager stated that

18   employees there were paid on an hourly basis for on-call work as of 2002 or 2003.  Despite plaintiffs'

19   counsel's assertions at oral argument that the on-call claim is amenable to common proof by means of

20   a written policy, the evidence submitted by the parties demonstrates that the Court's analysis of whether

21   plaintiffs were required to perform on-call work without proper pay would be highly individualized.

22   Accordingly, class treatment of Subclass II is not appropriate.

23

24   **III.     Subclass III: Training Compensation Policy**

25          Plaintiffs assert that Subclass III presents a common issue as to whether Alderwoods required

26   employees to attend mandatory training sessions and did not compensate employees for attending

27   training when it fell outside their regular work hours.  Again, the evidence submitted by the parties

28   reflects a variety of experiences with respect to compensation for training.  Florida, Texas, and New

**United States District Court**
For the Northern District of California

13

1   York plaintiffs stated that they were required to attend various types of training after work and were not

2   compensated for that time.   On the other hand, a Massachusetts plaintiff was paid for after-work

3   training.

4       There is also great variance in the evidence with regard to plaintiffs' training allegations

5   concerning funeral directors.  Although several Pennsylvania plaintiffs and one Arizona plaintiff stated

6   they were not compensated for licensing and continuing education requirements, Washington and

7   Alaska funeral directors stated they did not need to attend any training because those states did not

8   require continuing education.

9       Resolution of plaintiffs' claims concerning the training policy would primarily require

10  consideration of individual issues.  The Court would need to determine, for example, the specific funeral

11  home or homes in which any such policy was applied, and which category or categories of employees

12  it was applied to.  Moreover, resolving this issue with regard to funeral directors would require inquiry

13  into each state's requirements for maintaining a funeral director's license.  In light of these issues, the

14  Court concludes that individual questions predominate and that Subclass III is inappropriate for class

15  consideration.

16

17  **IV.    Subclass IV: Pre-Needs Policy**

18      Plaintiffs assert that Subclass IV involves the common issue whether employees were required

19  to schedule pre-needs presentations at the convenience of families, even if such appointments had to be

20  scheduled outside regular work hours, and were not compensated for time spent making such

21  presentations. However, once again, the evidence reflects varying experiences. Mississippi, New York,

22  and Louisiana plaintiffs testified at their depositions that they were required to make off-the-clock,

23  unpaid pre-needs appointments.  On the other hand, Washington and Texas funeral directors, among

24  others, stated that they were compensated for making after-hours pre-needs presentations.  In addition,

25  several plaintiffs testified that their funeral home locations maintained a separate salesperson or sales

26  staff to take care of pre-needs sales.  Thus, it is clear that resolving plaintiffs' claims under Subclass IV

27  would require individualized inquiries into the circumstances present at each funeral home location,

28  overwhelming any common questions.

**United States District Court**
For the Northern District of California

14

**United States District Court**
For the Northern District of California

1

2   **V.      Subclass V: Meal Break Policy**

3         Plaintiffs identify several common issues under Subclass V, including whether employees were

4   required or permitted to work through lunch breaks without pay, whether management was aware of this

5   practice and even altered employee time cards to exclude payment for work done during breaks, and

6   whether employees were told during meetings that they could not seek payment for work performed

7   during a break.  Plaintiffs' own identification of supposedly common issues, however, reveals the

8   individualized nature of the questions the Court will have to resolve.  In particular, individualized

9   inquiry is required to determine whether a given manager was aware that a given employee worked

10  during his or her meal break, whether any managers altered time cards to exclude time spent working

11  during meal breaks, and whether particular staff meetings included instructions not to seek payment for

12  work done during a break.  Because individualized issues would overwhelm any common issues

13  presented with respect to this set of allegations, the Court finds that class treatment of Subclass V is not

14  warranted.

15

16  **VI.     Subclass VI: Pre-Approval Policy**

17        Plaintiffs assert that Subclass VI presents common issues, including whether employees were

18  required to obtain pre-approval for overtime or would not be paid for such work, and whether this pre-

19  approval policy was contained in Alderwoods' policy manuals, policy memos, and announced at staff

20  meetings.  As stated above with respect to other subclasses, the significant variations among plaintiffs

21  regarding whether they were able to obtain compensation undermines plaintiffs' claim that this subclass

22  is amenable to common proof. While Massachusetts, Mississippi, Alaska, and Florida employees stated

23  that they were not paid for overtime that had not been pre-approved, North Carolina, California, and

24  another Alaska employee stated that they were not subject to any pre-approval policy.  The Court also

25  has doubts regarding plaintiffs' ability to prove a uniform policy of not compensating for non-pre-

26  approved overtime hours in light of the evidence that the policy manual stated only that failing to obtain

27  pre-approval may lead to discipline, not nonpayment.

28

**United States District Court**
For the Northern District of California

**VII.   Subclass VII: Unrecorded Work Time Policy**

Plaintiffs assert that Subclass VII presents common issues as to whether Alderwoods' policy directed employees not to record all their work time, and whether management was aware that employees performed work before or after their scheduled shifts but directed employees not to record that time and even altered time sheets to reduce the number of hours worked.  As with plaintiffs' meal break policy claim, plaintiffs' construction of the issues presented by this subclass reveals that class treatment is not appropriate.  To resolve the claims of this subclass, the Court would need to determine whether individual managers were aware that their employees worked off-the-clock, whether these managers encouraged or directed employees not to record that time, and whether any managers altered time cards that did reflect pre- and post-shift work.  These questions are not amenable to classwide proof and would overwhelm any common issues presented by Subclass VII.

**VIII.   Subclass VIII: Regular Rate Policy**

Plaintiffs state that Subclass VIII presents a common question regarding whether Alderwoods "systematically" failed to include bonuses and commissions in an employee's regular rate of pay. Plaintiffs' counsel stated at oral argument that this claim may be supported by common proof of an unlawful regular rate policy.  Based on the evidence submitted, however, the Court has serious doubts as to plaintiffs' ability to prove that Alderwoods had a uniform policy of excluding certain types of remuneration in calculating the regular rate of pay, as opposed to a temporary glitch.  In addition, although plaintiffs assert that the failure to include bonuses and commissions presents a classwide issue, plaintiffs will need to prove on an individual basis whether each plaintiff was even eligible to receive bonuses and commissions in his or her job category.

In sum, the Court finds that with respect to each of the eight policies identified in the SAC, individual factual issues would overwhelm any common questions presented, regardless of the whether, as plaintiffs claim, wage and hour laws are substantially similar across jurisdictions.  Plaintiffs acknowledge that the legal questions presented in this case are to be "answered for all class members on the same basic facts."  Mot. for Class Cert. at 30.  Where those facts require extensive individualized

16

**United States District Court**
For the Northern District of California

1   inquiry, any similarity in the various states' wage and hour laws cannot salvage plaintiffs' bid for

2   certification under Rule 23(b)(3). Moreover, this case presents certain overarching legal questions that

3   must also be answered on an individualized basis. For example, although plaintiffs purport to define

4   the class to include only "hourly non-exempt employees," they offer little information on how the

5   various states determine an employee's exempt status. Whether each position included in the putative

6   class (e.g., funeral director, office manager, etc.) is a non-exempt position must be determined on an

7   individualized basis, position-by-position and state-by-state. Plaintiffs also offer little information as

8   to each state's statute of limitations for wage claims.

9        For the foregoing reasons, the Court finds that plaintiffs have not shown that common questions

10  predominate over individual questions, and therefore have not satisfied the requirements of Rule

11  23(b)(3).

12

13  **II.        Remaining Rule 23(b) Arguments**

14        Plaintiffs assert in the alternative that they are entitled to certification under Rule 23(b)(1) or

15  Rule 23(b)(2). Rule 23(b)(1) provides for the certification of a class action to "eliminate the possibility

16  of adjudications in which the defendant will be required to follow inconsistent courses of continuing

17  conduct." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1194 (9th Cir. 2001) (citation omitted).

18  Plaintiffs acknowledge that, under Ninth Circuit law, class certification under this rule is inappropriate

19  where the primary relief sought is money damages. *Id.* at 1193. In their papers, plaintiffs therefore ask

20  the Court to certify the suit only for the liability phase. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate,

21  an action may be brought or maintained as a class action with respect to particular issues."). However,

22  as discussed in detail above, the question of Alderwoods' liability is predicated on a number of

23  significant individualized factual questions that are not appropriate for class treatment. Accordingly,

24  certification under Rule 23(b)(1) is inappropriate.

25        A court may certify a class under Rule 23(b)(2) where "the party opposing the class has acted

26  or refused to act on grounds that apply generally to the class, so that final injunctive relief or

27  corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

28  23(b)(2). It appears that plaintiffs have abandoned their position that certification is warranted under

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Rule 23(b)(2), as their reply brief makes no mention of this argument and they did not raise it at oral argument. In any event, under Ninth Circuit law, "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. Certification of a class seeking money damages is appropriate only where that relief is "merely incidental" to a claim for injunctive relief. *Id.* Plaintiffs have acknowledged for purposes of Rule 23(b)(1) that their primary claim in this case is for money damages, not injunctive relief. As defendant points out, plaintiffs' suit encompasses only the period of time before Alderwoods was taken over by SCI, and only seeks relief as to policies in effect up to that time. *See* SAC ¶ 14. Because "the bulk of the suit focuses on the old policy," and there are no claims related to SCI's policies in this lawsuit, certification under Rule 23(b)(2) is not appropriate. *See Stuart v. Radioshack Corp.*, No. 07-4499, 2009 WL 281941, at \*13 (N.D. Cal. Feb. 5, 2009).

**CONCLUSION**

For the foregoing reasons and for good cause shown, plaintiffs' motion for class certification is DENIED. (Docket No. 187).

**IT IS SO ORDERED.**

Dated: December 29, 2010

SUSAN ILLSTON
United States District Judge